# CHARLESTON

## PERRY v. OERMAN & BLAEBAUM.

Submitted January 16, 1908.    Decided February 18, 1908.

1. BILLS AND NOTES—*Bona Fide Purchase—Defenses—Want of Authority.*

    The doctrine that an agent disposing of the property of his principal without authority transfers no title as against the principal, does not apply to currency, or negotiable instruments without restrictive endorsement, where they have come into the hands of a *bona fide* purchaser for value without notice. (p. 569.)

2. PRINCIPAL AND AGENT—*Misuse of Principal's Property.*

    To make one liable by reason of participation in misuse of money of the principal by an agent, upon the ground that it was used to pay the private debt of the agent, it is necessary to show not only that the party sought to be charged was aware that the money belonged to the principal, but also that he was aware that the debt paid by it was in fact a private debt of the agent, or such a debt that payment thereof could not lawfully be made out of such money. (p. 569.)

3. TRUSTS—*Misappropriation of the Fund—Liability of Third Party.*

    It must be shown that he knowingly partakes in the breach of trust, to charge a third person as a party to misappropriation of a trust fund. (p. 569.)

Appeal from Circuit Court, Greenbrier County.

Bill by Solomon F. Perry against Oerman & Blaebaum. Decree for plaintiff, and defendants appeal.

*Modified and Affirmed.*

HENRY GILMER, for appellants.

McWHORTER & McWHORTER, for appellee.

ROBINSON, JUDGE:

Eliminating all matters not relating to the single point at issue upon this appeal, the case is this: Solomon F. Perry had a logging contract with Oerman & Blaebaum, of York, Pa., relating to their timber which was being cut on Robins Run, in Greenbrier County. Barnes was their agent, or manager on the ground. Ten miles away, at Wade's Draft, Barnes was operating a mill in other timber, as Perry, at the time, believed for this same York firm; but, as it turns out

in evidence, for himself, under name of Barnes Lumber Company. Perry had contract for logging there, also. The firm sent check for $300 to Barnes, dated July 13, 1905, payable to Barnes Lumber Company. Of the amount so received, Barnes paid Perry $150 by check of Greenbrier Pole Company. This payment was applied by Perry on the Wade's Draft contract, by express understanding with Barnes, as he insists. Barnes says there was no direction concerning its application. After Barnes had become financially involved and left, owing his principals on account of his agency at Robins Run, and Perry on account of the Wade's Draft contract, and Perry had gone on and satisfactorily completed the contract at Robins Run, the parties were unable to agree upon settlement as to the latter contract, because Oerman & Blaebaum insisted that the $150 be thereon applied. Thereupon, this suit, attachment in equity, was instituted against them by Perry, and, upon answer, general replication, and proof taken, there was hearing, which resulted in decree allowing such payment to be credited to Oerman & Blaebaum on the Robins Run contract. Complaining of this allowance of credit and the change of its original application by the parties, the plaintiff has appealed. Other matters are involved in the suit, but only as to the aforesaid item is our consideration demanded. The decree is for $147.22, with interest from December 15, 1905, in favor of plaintiff against said defendant firm; but plaintiff insists that it is erroneous in not being in a sum larger by said $150.

.This case turns upon the question of fact whether Barnes committed a breach of trust in applying the money to his own debt, and, if he did, whether Perry was a party to that breach of trust. On behalf of Oerman & Blaebaum, it is contended that their agent misappropriated the $150 so received, applied it to his private debt to Perry; and that, therefore, Perry is chargeable with the sum on what is due him from them on the Robins Run contract. This view was accepted by the court below, but careful consideration of the evidence leads us to conclude that the credit was improperly applied in the decree. While argument is made upon the fact that Barnes was the son-in-law of Perry, yet we observe nothing in proof that causes this relationship to be of weight. It does not appear as intimate as the relationship between Barnes and

Oerman & Blaebaum, still existing when Barnes' deposition was taken in their city of York, on their behalf. The fact stands out clearly that Perry cannot be charged with knowledge that Barnes, at the time of the payment aforesaid, was misappropriating money of his principals by such payment. Nor is it shown that there was such misappropriation. In fact, the opposite is to be inferred. Perry says that Barnes told him that he had received the check from the firm to pay up expenses on the Wade's Draft job; that he claimed it to be his money; that he did not have the check in his hand; and that he could not tell whether he was getting all the money from them. This is the substance of Perry's knowledge that he was being paid with the money from this firm. Significant, indeed, is it that the check for $300 from which this payment was taken was made payable to Barnes Lumber Company, the very concern that, as it later appeared, was operating at Wade's Draft. Does it not look like an advancement for such purpose, rather than a check for money to be disbursed by him as their agent at Robins Run? A statement made by Barnes to the millman, King, who appears a wholly disinterested witness, supports this. Barnes said that *his* $300 had come, but that which King and his father were expecting from Oerman & Blaebaum on their sawing at Robins Run had not. And it appears that, at this time, there was much less than $150 due Perry on the Robins Run contract from Oerman & Blaebaum. Nowhere in the testimony of the defendants do they deny that this check was sent to be used as Barnes said it was to be used, and did use it. Then, it is also significant that Perry had been made to believe that Oerman & Blaebaum were operating at both places. Consistent with such belief on his part is the proof that the sawmill at Wade's Draft had been furnished by this firm, and Oerman and his brother, as witnesses, both express familiarity with Wade's Draft. True, the evidence shows that, in fact, the firm was not interested there, except that they owned the mill, which Barnes had contracted to buy; but the incidents were such as would lead Perry to believe them to be interested, as he said he did. Really, the contrary does not appear but that Perry was justified in believing that Oerman & Blaebaum were his paymasters at Wade's Draft, as well as at the other place. These, and other things dis-

closed in the proof, convince us that Perry accepted the money, so paid him, in good faith, on the Wade's Draft job, and so applied it. And, in absence of evidence otherwise, it cannot even be said that it was not intended by Oerman & Blaebaum to be so applied, especially since the check was payable to Barnes' concern. Most certain it is that no knowledge can be imputed to Perry, from the evidence herein, which would charge him with collusion or improper conduct in this transaction with Barnes. To affect Perry in the premises, it would have to appear that he had knowledge of, or participated in, the unauthorized act of Barnes. This is consistent with *Rohrbough* v. *Express Co.*, 50 W. Va. 148, wherein it is held: "The powers of an agent are to be exercised for the benefit of his principal only, and when he acts otherwise, with knowledge and participation of the person relying upon his unauthorized act, his principal is not bound by such act." Nor does the doctrine that, where an agent disposes of his principal's property without authority, he transfers no title as against the principal, apply to currency or negotiable instruments without restrictive endorsement, where they have come into the hands of a *bona fide* purchaser. Clark & Skyles on Agency, sections 546 and 547. In *Fifth National Bank* v. *Village of Hyde Park*, 101 Ill. 595, there is deduced from much eminent authority the law which fittingly applies to the case before us: "To charge a stranger to a trust fund as a trustee, by reason of participation in a misapplication of the fund, upon the ground that the fund was used in payment of a private debt of the original trustee, it is necessary to show not only that the party sought to be charged was aware that the fund was a trust fund, but also that he was at the time aware that the debt paid by it was in fact a private debt, or such a debt that payment thereof could not lawfully be made out of such fund." Perry not only was without notice of, and participation in, the misuse of the money of Oerman & Blaebaum, if there had been proved a misappropriation, but it appears that he was not even aware that they were not his proper debtors on the Wade's Draft contract when the payment was made him, and that he was being paid the private debt of Barnes.

But more controlling than all else, Oerman & Blaebaum have not established that the $300 check was actually sent

for account of Robins Run work, and that Barnes actually committed breach of trust relative to it. They insist herein that it should be applied on Robins Run contract; but, mark you, they do not show that it was originally intended to be so applied. Its being payable to Barnes Lumber Company would permit that payee to make such use of the proceeds as it desired, unless specifically directed as to its application by the drawers. No specific direction for the application of this check is shown to have been made at the time it was sent Barnes by Oerman & Blaebaum. It bore no restrictive endorsement, and did not show that it was intended for a special purpose. By the check, as far as shown, Oerman & Blaebaum simply made Barnes Lumber Company their debtor. In short, Oerman & Blaebaum failing to show that Barnes did in fact, misappropriate this $150, and that Perry had knowledge thereof, the application of the payment as made by Perry at the time, on the Wade's Draft contract, should not be disturbed. The testimony conclusively points to the fact that, as between Perry and Barnes, at the time, such application was intended and made. They had the right to agree on its application to a specific debt. If, as Barnes says, nothing was said as to its application, Perry had a right to apply the payment as he desired. *Buster* v. *Holland*, 27 W. Va. 531; *Poling* v. *Hoffman*, 41 W. Va. 200.

So much, therefore, of the decree as credits Oerman & Blaebaum with said sum of $150 on the debt due from them to Perry is erroneous, and to such extent will be modified. Then the decree is that Oerman & Blaebaum do pay Solomon F. Perry the sum of $297.22, with interest from December 15, 1905, and the costs: and, as so modified, it will be affirmed, with costs to appellant.

*Modified and Affirmed.*